IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

**STEPHANIE STOCKDALE,**

    **Plaintiff**

v.            Case No.

           **JURY TRIAL DEMANDED**

**SENTARA HOSPITALS, INC.,**

    **Defendant**

    **Serve: CT Corporation System**
         **4701 Cox Rd., Ste. 285**
         **Glen Allen, Virginia 23060**

## COMPLAINT

COMES NOW the Plaintiff, Stephanie Stockdale ("Plaintiff" or "Ms. Stockdale"), by counsel, and as and for her Complaint against the Defendant, Sentara Hospitals, Inc. ("Defendant" or "Sentara") states as follows:

### Parties

1. Plaintiff is a natural person and a resident of the Commonwealth of Virginia and the City of Norfolk, Virginia. Plaintiff is an African-American woman.

2. Sentara is a Virginia corporation with its principal office in Norfolk, Virginia. Sentara owns and/or operates several hospitals and other healthcare facilities including Sentara Norfolk General Hospital, at which Plaintiff was employed at all relevant times.

### Jurisdiction and Venue

3. This civil action arises under the laws of the United States, specifically, Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d-7 and 2000e, *et seq.,* At all relevant times,

Defendant has employed more than five-hundred and one (501) persons. Jurisdiction is proper in this Court.

4. Venue is proper in this District and Division because the Defendant conducts business within the City of Norfolk, Virginia and the events complained of herein took place within the City of Norfolk.

### Exhaustion of Administrative Remedies

5. Prior to instituting this civil action, Plaintiff timely filed an administrative claim with the Norfolk office of the Equal Employment Opportunity Commission ("EEOC"). *See* Exhibit 1.

6. On or about January 14, 2021, the EEOC issued a "right to sue" letter to Plaintiff after failing to resolve the Plaintiff's administrative claim, with Plaintiff receiving it on or about January 19, 2021. *See* Exhibit 2. Plaintiff has filed the instant civil action within ninety (90) days of her receipt of notice authorizing her to file this civil action in federal or state court.

### Facts and Background

7. Plaintiff began employment with Defendant as an operations coordinator in or around July of 2012. In approximately March of 2019, Ms. Stockdale transferred to a research assistant position in Defendant's Cardiac Research Department. At all times relevant herein, Defendant was an "employer" and Plaintiff was an "employee" under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.*

8. As a research assistant, Ms. Stockdale's job duties included assisting research coordinators and research nurses with clinical trials.

9. At the beginning of her tenure as a research assistant, Ms. Stockdale was one of four research assistants in the Cardiac Research Department—the other three were white females, with Plaintiff being the only African-American research assistant.

10. During the months of March and April, Defendant largely tasked the other research assistants with training Plaintiff. This differed from training provided to those other research assistants, who would largely be trained by research coordinators. The three other research assistants and/or research coordinators would require Plaintiff to perform timed tasks, which was not required of the research assistants aside from Plaintiff.

11. The other three research assistants and, sometimes, research coordinators, would often berate and harass Plaintiff including discussing her as if she was a problem or burden in a manner calculated for Plaintiff to hear and, on at least one occasion, comparing training Plaintiff in an email, to a dog being "boarded."

12. In April of 2019, Defendant restructured the Cardiac Research Department by combining it with the vascular research department under a broader umbrella of "Research Operations." Dr. Jennifer May, a psychologist, became manager of Research Operations.

13. On or about April 26, 2019, Plaintiff made a complaint to Defendant's Human Resources Department regarding, *inter alia*, unsafe laboratory practices, the lack of appropriate training given her as well as the ongoing hazing and harassment. At various times, Ms. Stockdale also complained to Dr. May regarding her training and treatment.

14. Following Plaintiff's complaints to her as well as to Human Resources, Ms. May began spending significant amounts of time away from her office on the other side of the hospital and actually in the research unit micromanaging Plaintiff, even at one point requiring Plaintiff to

construct a research binder on a fictional study (and thus taking Plaintiff away from her actual work), which was not apparently required of other research assistants.

15. On or about May 16, 2019, Plaintiff complained to Dr. May that her office computer did not have a specific software program, "Prosolv," that the other research assistants had. This program allowed the other research assistants to easily download certain patient heart images necessary for Plaintiff's job. Because Plaintiff did not have this program, she was forced to engage in a time-consuming process of physically obtaining the images burnt onto discs from another part of the hospital and then downloading the images from the discs to her work computer. Despite repeated requests, Dr. May did not provide Prosolv to Plaintiff until October of 2019. Plaintiff additionally experienced other disparate treatment regarding a lack of direct access to various other databases, which caused delays to her work, which was then used against her by Defendant.

16. On or about June 10, 2019, Dr. May gave Plaintiff a written performance notice and stated that Plaintiff was not meeting expectations. Plaintiff again complained to Dr. May about the lack of real training she was provided as well as the bullying and harassment from the other research assistants, which Dr. May dismissed.

17. Over the next several months, Dr. May required weekly meetings with Plaintiff. Plaintiff quickly noticed that other research assistants or research coordinators often were aware of what was discussed in the meetings, as if Dr. May was discussing the meetings with them.

18. On or about July 2, 2019, Plaintiff filed Charge No. 437-2019-01168 with the EEOC (the "First Charge"). *See* Exhibit 3. In the First Charge, Plaintiff alleged that she was being discriminated against in the terms and conditions of her employment due to her race as

well as due to retaliation for engagement in protected activities by complaining about unfair treatment and/or a hostile work environment.

19. Upon information and belief and in accordance with EEOC process and procedure, Defendant was subsequently notified of the First Charge by the EEOC in July of 2019 and, indeed, subsequently filed a position statement with the EEOC.

20. Over the next few months and continuing through Plaintiff's final termination, the Defendants' mistreatment of Plaintiff intensified. Dr. May assigned two research coordinators to act as "mentors" to Plaintiff, who continued the bullying of Plaintiff while seemingly doing anything possible to undermine Plaintiff's work including, but not limited to:

   a. continuing to deny Plaintiff necessary software and/or log-in information provided to others outside of her protected categories;

   b. refusing to sign off on Plaintiff's competency log;

   c. hiding laboratory equipment needed by Plaintiff;

   d. refusing training or assistance to Plaintiff;

   e. offering to clean up minor workplace spills, then not doing so and blaming Plaintiff;

   f. providing Plaintiff with incorrect or inconsistent job information and instructions;

   g. providing Plaintiff with incorrect or inconsistent project or task due dates;

   h. reporting Plaintiff to Dr. May for false or non-existent policy violations;

   i. delaying or holding materials from Ms. Stockdale in order to set her up for appearing to be "slow" in the commission of assigned tasks;

   j. berating Plaintiff in front of others.

21. On multiple occasions, Plaintiff complained of the foregoing to Dr. May and/or others within Defendant's hierarchy, however, her concerns were generally disregarded and no corrective action was taken.

22. Despite the alleged deficiencies in Plaintiff's work, beginning in the summer of 2019, Defendant assigned Plaintiff the work load of multiple research assistants, further setting her up for failure.

23. On or about August 19, 2019, Dr. May summoned Plaintiff into a closed-door meeting with her and manager Janice Devlin. During this meeting Dr. May accused Plaintiff of having poor judgment and ineffective communication skills. Dr. May presented Plaintiff with a paper referral to Defendant's Employee Assistance Program ("EAP")—mental health counseling—stating these and similar alleged concerns as problem areas. Plaintiff refused to sign the referral, which caused Dr. May to become visibly angry. Ms. May then called the EAP coordinator, with Plaintiff in the office, and asked for an appointment for Plaintiff while falsely claiming that Plaintiff consented. The EAP coordinator gave Dr. May an appointment date and time for Plaintiff and advised Dr. May that it would be with a counselor Plaintiff had previously seen. Plaintiff subsequently called both EAP and Human Resources to complain about Dr. May's actions and was advised that she did not have to attend the appointment.

24. On or about Friday, October 4, 2019, Plaintiff again complained to Human Resources regarding her treatment as well as inconsistent instructions given to her in an apparent attempt to set her up for failure and/or insubordination. Plaintiff then received an email from Director of Research Kathleen Barackman asking Plaintiff to call her. Plaintiff called Ms. Barackman and spoke to her about her various complaints including an apparent attempted set-up regarding the timing of processing blood and urine samples earlier that day. Ms. Barackman advised Plaintiff that Dr. May was out of the office that day. Plaintiff additionally emailed Audrey Douglas-Cooke, a vice president of the heart hospital, regarding her workplace concerns.

25. On or about Monday, October 7, 2019, Dr. May returned to the office and met with Plaintiff. During this meeting, Dr. May advised Plaintiff that she was going to be suspended without pay due to an alleged "violent incident" occurring the previous Friday. Dr. May demanded Plaintiff's badge and keys and told her to leave the premises immediately, which Plaintiff did promptly.

26. Plaintiff called and spoke with Human Resources on Friday, October 11, 2019 about the unpaid suspension and was advised that Dr. May had not completed the suspension paperwork. Dr. May called Plaintiff later that same day and told her she could return to work on Monday, October 14, 2019.

27. When Plaintiff returned to work on Monday, both Human Resources and Dr. May advised her that the investigation was unfounded and that there had been no violent incident. Plaintiff found that some of her items were missing from her workstation and that the desktop system on her computer had been altered and various emails had been apparently deleted or hidden, which further impacted Plaintiff's ability to perform her job.

28. On or about October 16, 2019, Dr. May gave Plaintiff a thirty-day performance improvement plan ("PIP"). Ms. May told Plaintiff to use a spreadsheet Dr. May had developed to log her daily activities. The spreadsheet was cumbersome and very time-consuming on top of Ms. Stockdale's existing workload. Furthermore, it did not contain entries for every type of task that Ms. Stockdale regularly performed, thus limiting her ability to fully report her activities. Ms. Stockdale subsequently complained to Dr. May about the spreadsheet. Upon information and belief, no other research assistants were forced to use this spreadsheet to record their daily activities.

29. On or about November 5, 2019, Plaintiff emailed Dr. May to complain that she was being assigned multiple labs every day, sometimes to occur simultaneously, which to Plaintiff's information and belief were not assigned to other research assistants.

30. On or about November 12, 2019, Dr. May terminated Plaintiff for various false and pretextual stated reasons relating to alleged poor performance, despite it not having been thirty days since the PIP.

## Count I—Retaliation in Violation of Title VII, 42 U.S.C. § 2000e, *et seq.*

31. Plaintiff incorporates by references the allegations of Paragraphs One through Thirty as if set out in full herein.

32. Defendant discriminated against Plaintiff with regard to the terms and conditions of her employment, specifically, with regard to her discharge, disparate treatment and/or allowing a hostile workplace to exist, due to her engagement in protected activities including filing a charge with the EEOC and making complaints to her supervisor and/or human resources, regarding harassment, discrimination and/or a hostile workplace based upon her race (black), or alternatively, what Plaintiff reasonably believed to be harassment, discrimination and/or a hostile workplace, all of which Defendant knew of. Plaintiff's complaints were protected activities.

33. This retaliation against Plaintiff for engaging in protected activities constituted a violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*.

34. The Defendant's conduct was motivated by malice, spite and ill will; was willful and wanton, and evinced conscious disregard for the rights of Plaintiff.

35. Defendant's acts of malice, spite, and ill will which evince a conscious disregard for the rights of Plaintiff include, but are not limited to: retaliating against her due to her

engagement in protected activity and discharging her because of her engagement in protected activity.

36. As a direct and proximate result of the Defendant's actions, Plaintiff has suffered and continues to suffer economic and non-economic damages, including lost back pay, lost front pay, lost benefits and other wages, emotional distress and attorney's fees and costs. Due to the severity of Defendant's conduct, Plaintiff is also entitled to punitive damages.

**Count II--Discrimination in Violation of Title VII of the Civil Rights Act of 1964**

37. Plaintiff incorporates by reference the allegations of Paragraphs One through Thirty as if set out in full herein.

38. Defendant discriminated against Plaintiff with regard to the terms and conditions of her employment, specifically, with regard to her termination and pre-termination discipline, as well as with regard to disparate treatment and/or allowing a hostile workplace to exist, due to her race.

39. The termination and pre-discipline termination , as well as the disparate treatment of Plaintiff, as well as allowing a hostile workplace to exist, constituted a violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*.

40. The Defendant's conduct was motivated by malice, spite and ill will; was willful and wanton, and evinced conscious disregard for the rights of Plaintiff.

41. As a direct and proximate result of the Defendant's actions, Plaintiff has suffered and continues to suffer economic and non-economic damages, including lost back pay, lost front pay, lost benefits and other wages, emotional distress and attorney's fees and costs. Due to the severity of Defendant's conduct, Plaintiff is also entitled to punitive damages.

WHEREFORE, the Plaintiff, Stephanie Stockdale, by counsel, prays that this honorable Court grant her such relief to which she is entitled including, but not limited to, lost back pay, loss of front pay, unpaid wages, unpaid overtime, compensatory damages, nominal damages and punitive damages, attorney's fees and litigation costs and such other relief as deemed just and proper.

**PLAINTIFF DEMANDS TRIAL BY JURY ON ALL ISSUES SO TRIABLE**

**STEPHANIE STOCKDALE,**

  /s/Steven B. Wiley
Steven B. Wiley (VSB No. 47531)
WILEY LAW OFFICES, PLLC
440 Monticello Ave., Suite 1817
Norfolk, Virginia 23510
(757) 955-8455
(757) 319-4089 facsimile
swiley@wileylawoffices.com

*Counsel for Plaintiff*